PEOPLE *v.* TURNER

1. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—PREJUDICE.
  Gruesome photographs may be admissible in evidence when rele-
  vant to a material point but are inadmissible if their possible
  prejudicial effect outweighs their probative value.

2. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—DISCRETION.
  Determination of admissibility of photographs is within the
  sound discretion of the trial court.

3. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—ALTERNATE PROOFS.
  Gruesome photographs may be admitted in a criminal prosecu-
  tion only after the people have established that there are no
  alternative proofs available or that an issue is so highly con-
  troverted as to be incapable of proof through alternative
  means.

4. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY.
  Photographs are inadmissible in evidence if: 1) they are not
  material to any point at issue, 2) they do not adequately rep-
  resent the person, place, or thing photographed, or 3) they
  are calculated to inflame the jury.

5. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—AUTOPSY.
  Autopsy photographs depicting a decedent's mutilated skull and
  internal organs were inadmissible where the cause of death
  was undisputed and cogent medical testimony at trial was

REFERENCES FOR POINTS IN HEADNOTES
[1] 30 Am Jur 2d, Evidence §§ 787, 790, 792, 798.
[2] 53 Am Jur, Trials § 100.
  30 Am Jur 2d, Evidence §§ 785–788.
[3] 30 Am Jur 2d, Evidence §§ 787, 790, 792, 798.
[4] 53 Am Jur, Trials § 100.
  30 Am Jur 2d, Evidence §§ 783–787, 1105.
[5] 30 Am Jur 2d, Evidence §§ 787, 790, 792.
[6] 30 Am Jur 2d, Evidence §§ 786, 787, 789, 792.
[7] 30 Am Jur 2d, Evidence §§ 786, 787, 792.

adequate to describe medical findings without reference to the photographs whose inflammatory potential outweighed their evidentiary value.

6. Evidence—Photographs—Admissibility—Autopsy.

Autopsy photographs have an emotional effect on jurors and do not depict the corpse as left by its assailant but as it appears after extensive medical probing; therefore they must be restricted to that which is reasonably necessary to aid the jury visually in determining a question of fact.

7. Evidence—Photographs—Admissibility—Autopsy.

Autopsy photographs of a mutilated skull itself may have been of value to medical testimony as to cause of death in a prosecution for murder, but surgical instruments and other portions of the corpse depicted in photographs are irrelevant and prejudicial and necessitate a new trial.

Appeal from Wayne, Victor J. Baum, J. Submitted Division 1 October 10, 1968, at Detroit. (Docket No. 2,160.) Decided April 23, 1969.

Halbert Gene Turner was convicted of second-degree murder. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Jerome Harris,* for defendant on appeal.

BEFORE: J. H. Gillis, P. J., and R. B. Burns and J. J. Kelley,* JJ.

J. H. Gillis, J. On May 10, 1965, police were called to an apartment in Taylor, Michigan, where

---

* Circuit Judge, sitting on the Court of Appeals by assignment.

the body of a 22-month-old child, Rhonda Hensley, was found. The body was removed to the Wayne County morgue where an autopsy revealed the cause of death to be intracranial bleeding induced by a skull fracture. Several weeks later, defendant was arrested and charged with first-degree murder.[1] He was convicted by a jury of murder in the second degree.[2]

At trial, defendant did not contest the cause of death. It was his contention, however, that the injuries resulted from an accidental fall down some stairs or in a bathtub. The prosecution contended that severity of the skull fracture precluded any possibility that the child's death was accidental. The prosecution sought to prove circumstantially, from all the injuries on the child's body, that the child had been held by her feet and forcefully swung head first against a wall. In support of this theory, Dr. Edward Zawadski, the medical examiner who performed the autopsy, was called as a witness. During the autopsy, Dr. Zawadski had taken some color photographs of the victim. The prosecution sought to introduce the photographs into evidence before the jury and following objections by defense counsel, the court conducted a hearing outside the presence of the jury for the purpose of determining their admissibility.

At the hearing, Dr. Zawadski testified as follows:

"*Q. (Prosecutor.)* Now, doctor, based against your background with respect to these matters, the force or—I should say, or ask first, can you tell us with a degree of medical certainty whether or not some force was applied to this head?

"*A.* Necessarily a great deal of force must have been applied. As you may recall, this is a 22-month-old child, and—

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).
[2] CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549).

"*Q. (Interposing.)* What is the significance of that?

"*A.* Those individuals have rather pliable bones. In other words, they can bear considerable distortion. Children are always falling. They are bumping their heads and so forth, and still they don't ordinarily suffer any skull fracture. It is rather unusual, as a matter of fact, to have a child fracture their skull as a result of a fall.

"*Q.* What is the significance of what you were telling us with this particular fracture, in terms of the extent of force needed to do this to a 22-month-old?

"*A.* Well, with that in mind, you could use to produce a distinct comminuted fracture such as this—

"*Q. (Interposing.)* Comminuted fracture?

"*A.* It is—in other words, cracked like an egg, over a wide area. The distortion must have been tremendous.

\*     \*     \*     \*     \*     \*     \*     \*

"*Q.* Now, doctor, again to telescope and get to the issue that we are both concerned with, doctor, you said—I forgot the word—"tremendous" or with reference to the degree of force. Describe that specifically again for the court. I want to ask you another question.

"*A.* Well, specifically, the amount of distortion necessary to produce comminution of this extent, means that it would have to be very great. Because this skull can be or could have been destroyed by far without fractures. So the force must have been excessive, a great deal of it to produce something of this sort.

\*     \*     \*     \*     \*     \*     \*     \*

"*Q.* Keep in mind, now, that at the base of that stair is concrete, as the last platform so to speak, doctor, with reference to the kind of fracture you have described to us here and to the court assuming

this 22-month-old child that you learned of in the course of your autopsy was—had a fall, starting half-way of those steps down to that concrete portion, that is, from, say, the seventh step down, and in that respect rolled, so to speak, down to and landed on the concrete floor, would, based on your experience to the degree of reasonable medical certainty, would such a fracture as this be caused by such a fall? I might add, alone; no pushing by anyone—just rolled down. Would such a fall coming in contact with that concrete, cause this kind of fracture?

"*A.* On the basis of my experience and on the basis of my opinion for what it is worth, I would say that it would be very likely [?] that a fracture of this type could result.

"*Q.* Now you say "very unlikely". Would it at any time be likely?

"*A.* Well, in my experience I can't recall a single instance that we have had where a child that has had any similar extensive injury from a fall down the stairs.

"*Q.* Taking into account your observation to us medically about the pliability of a 22-year-old [*sic*] —head that you just gave us, will you explain that in connection with why you say it would be unlikely that this kind of fracture could occur to this child?

"*A.* The fall down a stairwell of this type of a child means that it would be bouncing down the stairs. So that although the total fall is quite a distance, there are, I think, interruptions in the fall so that the amount of force applied to the skull in the course of this fall would be somewhat limited. Even though there would be concrete at the very end, it would be—in my experience I have never seen anything as extensive resulting from any such fall.

          *     *     *     *     *     *     *     *

"*Q.* Did you take a slide of the bare fracture itself, below the scalp, so to speak, or the—

"*A. (Interposing.)* Yes. Pictures were taken of the head and then also—that is the scalp intact and also after the scalp was reflected forward and backward so that the skull was entirely exposed. A photograph was made of the skull proper, that is, a slide was made.

"*Q.* Doctor, until that scalp was laid back or as you have indicated, could you accurately describe—without it being laid back and exposed, without exposing the fracture, could you in any way come to a—an opinion as to the degree of force that would be needed to show that particular kind of fracture?

"*A.* No, you wouldn't, until you did see the skull itself.

"*Q.* And specifically in this case and this scalp?

"*A.* That is correct.

\*     \*     \*     \*     \*     \*     \*     \*

"*Q. (To the court.)* I would submit, your Honor, just to make this particular point for the record, we are making this—this would be the basis for our offer of the particular slide on the scalp."

The admissibility of the photograph was also urged on the ground that the severity of the skull fracture as depicted therein was relevant to a determination of the malice with which the crime was committed. See *State* v. *Martinez* (1968), 92 Idaho 183 (439 P2d 691), *cert. den.* (1968), 393 US 945 (89 S Ct 317, 21 L Ed 2d 283).

Defense counsel objected to the admission of the photograph. After pointing out that the cause of death was undisputed, he argued that the photograph was of little or no probative value in that the severity of the skull fracture could be adequately testified to without resort to a viewing of a photograph which would serve only to arouse the passions and prejudices of the jury. The trial court ruled as follows:

"The point seems to be that if a graphic representation of the film may be more accurate and more

meaningful than—and true to life than a verbal
description, and if the point for which the photo-
graph is offered is relevant and material, then we
may have the photographic exhibit.

"I am somewhat concerned about what the photo-
graph of the skull will do to the people who are
somewhat squeamish. I don't know whether I am
making a mistake in telling you at this point that I
am somewhat squeamish myself. I am running a
little temperature and that may have affected my
reaction. But the point is the point ought to be
made, that this massive skull fracture, comminuted,
involving several points and places of breakage,
could have occurred only by application of very
great force. We have testimony tending to show
that it is extremely unlikely that this kind of skull
fracture could have been sustained in a fall, even
from the top of the steps, or from the seventh step
—that is, half-way to the top. The relevance is that
it tends to exclude accidental death as one of the
hypothesis upon which the jury could find absence
of guilt. The totality of recent injuries depicted
by the photographs tend to have the same effect.
So it does seem to me that they are admissible."

Defendant contends on appeal that the ruling of the
trial court constituted reversible error.

It is difficult to imagine a more inflammatory sight
than that which was presented in vivid color to the
jury in this case. The child's head and part of her
chest were shown. The head was resting on a sup-
port placed above a steel laboratory pan in which
lay some of the instruments used in performing the
autopsy. An incision had been made in the chest
cavity which, when pulled apart, revealed part of
the rib cage and various internal organs. Another
incision had been made in the scalp just above the
neck behind the right ear which extended laterally
across the skull to the opposite side. Most of the
scalp was then pulled forward and pinned, covering

the ears and face and creating a tangled mass of bloody hair. More scalp and hair hung loosely from the back of the exposed skull. The skull itself, with the many fissures therein, was covered with blood. It is not at all surprising that the trial judge himself, at the sight of this photograph, admitted to being squeamish.

Until recently, photographs of a potentially inflammatory nature were admissible evidence if helpful in throwing light upon any material point in issue. *People* v. *Becker* (1942), 300 Mich 562; *People* v. *Ignofo* (1946), 315 Mich 626; *People* v. *Freeman* (1965), 1 Mich App 63. While gruesomeness, alone, does not render photographs inadmissible (see annotation, 73 ALR2d 769), our holding in *People* v. *Jenkins* (1968), 10 Mich App 257, recognized that photographic evidence relevant to a material point in issue may, nevertheless, be inadmissible if its possible prejudicial effect outweighs its probative value. *State* v. *Walker* (1960), 33 NJ 580 (166 A2d 567); *People* v. *Lefler* (1967), 38 Ill 2d 216 (230 NE2d 827); *Commonwealth* v. *Powell* (1968), 428 Pa 275 (241 A2d 119); 29 Am Jur 2d, Evidence, § 787; 23 CJS, Criminal Law, § 852(1)(c). In every case, the determination of the admissibility of photographs is left to the sound discretion of the trial court. *People* v. *Rogers* (1968), 14 Mich App 207.

In addition to stating that an autopsy of the skull was necessary to determine the nature and extent of the fracture, Dr. Zawadski testified that showing the photographs to the jury would be helpful in accurately describing the injury. Such foundation testimony by medical witnesses appears to be the usual procedure in this type of case. *Cf. State* v. *Johnson* (1953), 57 NM 716 (263 P2d 282); *People* v. *Brommel* (1961), 50 Cal 2d 629 (15 Cal Rptr 909, 364

P2d 845); *People* v. *Deriso* (1963), 222 Cal App 2d 478 (35 Cal Rptr 134); *Commonwealth* v. *Powell, supra.* Notwithstanding the fact,

"A trial court, to avoid even the risk of unfairness, should demand that a photograph be admitted only after the people establish either that no alternative methods of proof are available or that an issue is so highly controverted as to be incapable of proof through alternative means. In the present case, [the material points in issue] were capable of proof through other methods which should have first been exhausted before admission of the photos was considered. Having failed to require exhaustion of alternative proofs prior to admitting the photographs, the trial court abused its discretion." *People* v. *Rogers, supra,* Judge (now Justice) T. G. KAVANAGH concurring.

This test was reiterated in the more recent case of *People* v. *Brannon* (1968), 14 Mich App 690.

"The admission of photographs may be objected to: 1) because they are not material to any point in issue, see *People* v. *Becker, supra;* 2) because they do not adequately represent the person, place or thing photographed, see *People* v. *Herrell* (1965), 1 Mich App 666; or 3) because they are calculated to inflame the minds of the jurors, see *People* v. *Burns* (1952), 109 Cal App 2d 524 (241 P2d 308).

"Once an objection to photographs has been made on one or more of these grounds, the trial judge should, in exercising his duty to control the proceedings, satisfy himself that the photos are admissible in all respects. Since the admissibility of photographs is a matter for the discretion of the court, *Perri* v. *Tassie* (1940), 293 Mich 464, in the exercise of that discretion, with reference to the third ground for objection, the court should exclude the photographs if he concludes that the issue to be proved could be effectively established with evidence less potentially prejudicial."

Since the cause of death was undisputed, the only material points in issue were the severity of the skull fracture and the amount of force necessary to inflict such a wound. Both matters were the subject of clear and cogent testimony of Dr. Zawadski on the witness stand. Although an autopsy was required for him to ascertain the nature and extent of the injury a photograph was not required for him to adequately and effectively describe his findings to the jury. See *Commonwealth* v. *Powell, supra; People* v. *Lefler, supra; State* v. *Poe* (1968), 21 Utah 2d 113 (441 P2d 512); *McKee* v. *State* (1947), 33 Ala App 171 (31 So 2d 656). The photograph of the skull was not of such essential evidentiary value that its need clearly outweighed the likelihood that it would inflame the minds and passions of the jurors. *Commonwealth* v. *Eckhart* (1968), 430 Pa 311 (242 A2d 271); *Kiefer* v. *State* (1958), 239 Ind 103 (153 NE2d 899), *cert. den.* (1961), 366 US 914 (81 S Ct 1089, 6 L Ed 2d 238). The trial court abused its discretion by admitting it into evidence.

It may be presumed that today's jurors, inured as they are to the carnage of war, television and motion pictures, are capable of rationally viewing, when necessary, a photograph showing the scene of a crime or the body of a victim in the condition or the place in which found. *State* v. *Martinez, supra.* Photographs taken during an autopsy however, must be subjected to more careful scrutiny. To persons unaccustomed to such sights, they are even more gruesome and revolting than the goriest external photographs. In addition, they depict the corpse as it is left, not by its assailant, but by the probing instruments and procedures of the medical examiner. See *McKee* v. *State, supra; State* v. *Morris* (1963), 245 La 175 (157 So 2d 728); Crockett, C. J., concur-

ring in *State* v. *Renzo* (1968), 21 Utah 2d 205 (443 P2d 392).

Where an autopsy is necessary to expose a subdermal injury the nature or extent of which is relevant to a material point in issue and where a photograph of the injury has essential evidentiary value, fairness to an accused demands that the photograph be restricted to that which is reasonably necessary to furnish visual aid to the jury in determining the question of fact presented. If this photograph was helpful to the doctor's testimony it is only because of the skull itself, and not because of the laboratory pan, the surgical instruments, the open chest cavity, the tangled mass of bloody hair or the bloody scalp. These were all totally irrelevant and highly inflammatory.

"While the skull itself is not particularly pleasant to view, it is a veritable Michelangelo compared to the gruesome scalp and bloody web of tangled hair. * * * They could easily have been excised from the photograph. That they were not was prejudicial to appellant and necessitates a new trial." *Commonwealth* v. *Eckhart, supra.*

Reversed and remanded for a new trial.
All concurred.