PEOPLE *v.* EDDINGTON

1. SEARCHES AND SEIZURES — ENTRY WITHOUT WARRANT — LAWFULNESS — DEFENDANT'S ABSENCE — ARREST — WITHOUT WARRANT — PROBABLE CAUSE.

Absence of defendant in fact from his apartment did not affect the lawfulness of a detective's entry without an arrest warrant where, even before going there, that detective had probable cause to arrest defendant for the commission of a felony and, upon arriving at defendant's apartment, saw defendant's car parked outside, heard what appeared to be the rustle of more than one person inside and, upon request, was permitted by defendant's girlfriend to enter and to look around for defendant.

REFERENCES FOR POINTS IN HEADNOTES

[1–9]  5 Am Jur 2d, Arrest § 22 *et seq.*
[10, 11]  29 Am Jur 2d, Evidence § 790 *et seq.*
[12, 13]  58 Am Jur, Witnesses § 616 *et seq.*
[14–16]  29 Am Jur 2d, Evidence §§ 320, 321, 333.

2. SEARCHES AND SEIZURES—WITHOUT WARRANT—SUSPECT'S AB-
   SENCE.

   Validity of a search for evidentiary items following recognition
   by police of a suspect's absence from his premises need not
   be considered where the police first observed an evidentiary
   item while engaged in a lawful search for that suspect,
   believed hiding on the premises, where the search for that
   suspect had not yet ended at the time that evidentiary item
   was observed, and the police subsequently obtained a search
   warrant for that item based upon their observation of it while
   engaged in the prior legal search.

3. SEARCHES AND SEIZURES—LAWFUL SEARCH—PLAIN VIEW—EVI-
   DENCE.

   Detective's picking up of defendant's shoes to look at the
   heels was not an illegal search where he was lawfully search-
   ing for defendant in his apartment and recognized the shoes
   which were in plain view, as being similar to the type worn
   by the killer at the scene of a murder.

4. SEARCHES AND SEIZURES—CONCEALED OBJECTS—CONSTITUTIONAL
   LAW.

   A "search" in the constitutional sense implies a prying into
   hidden places for that which is concealed and that the object
   searched for has been hidden or intentionally put out of the
   way.

5. SEARCHES AND SEIZURES—PROTECTION OF PERSON—EXPECTATION
   OF PRIVACY—GOVERNMENT INTRUSION—CONSTITUTIONAL LAW.

   The Fourth Amendment to the United States Constitution
   protects people, not places, and wherever an individual may
   have a reasonable expectation of privacy he is entitled to
   be free from unreasonable governmental intrusion.

6. SEARCHES AND SEIZURES—PROTECTION FROM INTRUSION—CONSTI-
   TUTIONAL LAW—PRIVACY.

   The place of search, the type of information seized and the
   means of intrusion, are relevant factors to be considered in
   determining the parameters of personal privacy protected by
   the Fourth Amendment to the United States Constitution.

7. SEARCHES AND SEIZURES—CONCEALED OBJECTS—EXPECTATION OF
   PRIVACY—CONSTITUTIONAL LAW.

   Detective's action in lifting defendant's shoes and examining
   their heels did not constitute a search in the constitutional
   sense where the shoes were lying in a closet and were not

hidden nor intentionally put out of the way, and it did not appear that defendant exhibited a subjective expectation of privacy as to his shoes, or that he could reasonably have expected such privacy.

8. Searches and Seizures—Reasonableness of Search—Validity of Search.

Validity of a search depends on the law's appraisal of the reasonableness of that search since only unreasonable searches and seizures without warrants are barred (US Const, Am 4).

9. Searches and Seizures—Evidence—Warrant—Lawful Search.

Admission of defendant's shoes into evidence at his trial for murder was proper where the shoes were seized pursuant to a warrant based upon the knowledge of a detective who, while lawfully searching defendant's apartment to arrest him, discovered those shoes and recognized them as those probably worn by the killer at the scene of a murder.

10. Homicide—Criminal Law—Evidence—Photographs of Victims—Admissibility.

Colored photographs of murder victims detailing the nature and extent of wounds inflicted upon them were admissible in evidence for the purpose of clarifying and illustrating testimony relating to the victims' appearances and condition and to show the atrociousness of that crime or the malice with which it was committed.

11. Evidence—Photographs—Admissibility—Discretion.

Admissibility of photographs objected to as prejudicial and inflammatory is within the discretion of the trial judge.

12. Criminal Law—Evidence—Pending Charges—Admissibility—Discretion.

Cross-examination of a defendant with respect to pending charges lies within the discretion of the trial judge.

13. Criminal Law—Evidence—Pending Charges—Cross-Examination—Abuse of Discretion.

Permitting cross-examination of defendant with respect to murder charges pending against him was error where the trial court warned the prosecutor that he was on tenuous grounds in pursuing that subject and that he was to proceed at his own risk since the court, instead of exercising its own discretion, left the decision concerning use of the pending charges to the prosecutor.

14. CRIMINAL LAW — EVIDENCE — PENDING CHARGES — WITNESSES —
CREDIBILITY — EXCLUSION OF EVIDENCE.

Probative value of arrest and charges, unsubstantiated by a
conviction, is slight where the only issue is a defendant's
credibility; therefore, where a jury might misapply such
evidence justice requires its exclusion.

15. HOMICIDE—EVIDENCE—PRIOR UNPROVEN ACTS—ADMISSIBILITY.

Admission of evidence that defendant, on trial for a double
murder, had been also charged with a prior second double
murder, was reversible error since that evidence was mani-
festly and overwhelmingly prejudicial because it could only
suggest to the jury that defendant's career included repeated
assaults upon human life.

16. CRIMINAL LAW—HOMICIDE—EVIDENCE—PRIOR UNPROVEN ACTS—
ADMISSIBILITY.

A defendant is entitled to have his guilt or innocence determined
on the specific offenses charged against him and he is not
required to risk the possibility of conviction for a series
of unproven prior acts which collectively suggest that his
career has been reprehensible.

Appeal from Saginaw, Fred J. Borchard, J.  Sub-
mitted Division 3 December 4, 1969, at Grand
Rapids.  (Docket No. 5,986.)  Decided April 24,
1970.  Leave to appeal granted September 22, 1970.
384 Mich 755.

William H. Eddington, Jr., was convicted by a
jury of first-degree murder.  Defendant appeals.
Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *George E. Thick, II,*
Prosecuting Attorney, and *Donald A. Kuebler* and
*Paul G. Miller, Jr.,* Special Assistant Prosecuting
Attorneys, for the people.

*James A. Brisbois (Philip R. Sturtz* and *Jerold
H. Israel,* of counsel), for defendant on appeal.

Before: J. H. Gillis, P. J., and McGregor and Quinn, JJ.

J. H. Gillis, P. J. Defendant was convicted by a jury of the first-degree murders of Carl and Gertrude Middledorf. MCLA § 750.316 (Stat Ann 1954 Rev § 28.548). He appeals as of right, alleging an illegal search and seizure and trial error.

On the afternoon of February 4, 1967, Detective Robert Shelby of the Saginaw police department was told by an informer that Ronald Johnson and William Eddington had been involved in the Saginaw murders of Dr. Archer Claytor and his wife on February 2, 1967. Detective Shelby was also informed that the two men were responsible for an armed robbery which had occurred at 916 Norman Street, Saginaw, on January 25, 1967. This information was based on statements made to the informer by Johnson. A victim of the Norman Street robbery had previously identified Johnson from a mug shot as one of the two men who had robbed her.

On February 5, 1967, Detective Shelby was called to 1409 Cherry Street to investigate the killings of Mr. and Mrs. Middledorf. Shelby noticed that a window in the back door of the Middledorf house had been broken, presumably by the killer in gaining entry to the house. While in the house, Sergeant Christensen of the crime laboratory showed Shelby a distinctive heel print found near the bathtub where Mrs. Middledorf's body was discovered. The print had been dusted with fingerprint powder to make it more readily visible. A second print was found on a piece of glass that had been broken from the window of the back door. The print was distinctive because it was smaller than a print made from a regular man's shoe and had two or three ridges that stood out on the impression. After examining the

print, Detective Shelby concluded that the print was
made by "Stetson" shoes. He testified at the hearing
on defendant's motion to suppress:

"*A.* The print was a—I would say a print might
have come from a Stetson shoe. Now, the print was
smaller than a regular man's shoe and probably ap-
proach the size of a woman's Cuban heel shoe, but
they were cross characteristics of a man's shoe, the
crossings, also striations.

"*Q.* And the print itself?

"*A.* Yes, sir.

"*Q.* Have you ever owned any Stetson shoes?

"*A.* Yes.

"*Q.* What kind of shoes does Stetson usually
make?

"*A.* Well, the heel is relatively smaller than the
regular men's wear. It is more of a Cuban type
heel. I guess you could—well, the appearance of the
print looks like it could have been a beatle type boot.

"*Q.* What?

"*A.* A beatle type boot.

"*Q.* What do you mean by Cuban type heel?

"*A.* I refer to a Cuban type heel as a heel little
higher than the regular heel of the shoes men wear,
the sole of the shoe. I mean it would be tapered."

None of the shoes examined in the Middledorf house
matched Shelby's description.

After leaving the Middledorf residence, Detective
Shelby gathered a number of photographs and pro-
ceeded to 916 Norman Street to interview Jack
Prince, a second victim of the robbery. Prince iden-
tified William Eddington as one of the participants.
At this juncture of his investigation, Shelby be-
lieved that there was a connection between the rob-
bery and the Claytor and Middledorf murders. The
robbery victims and the decedents were all elderly
people; the weapon used in the robbery and the
Claytor murders was a small caliber firearm;

Ronald Johnson possessed a small caliber pistol which at one time had been owned by the informer; "Billy" (Eddington) had this gun when the informer sought to procure it for the police. Eddington was also known to have broken into certain homes by way of the back door as was done in each of the murders; furthermore, the victims of both the Claytor and Middledorf homicides had been bound with material found at the scene. Accordingly, Shelby immediately suspected that Eddington had been involved in the Middledorf murders.

Shelby then phoned the prosecutor and asked him to procure an arrest warrant against Eddington on a charge of robbery. At a subsequent meeting Shelby and the prosecutor discussed whether it was the appropriate time to pick up both Johnson and Eddington on charges of murder. It was decided that Shelby would arrest Eddington for robbery only.

On the evening of February 5, 1967, just before midnight, Detective Shelby, accompanied by several police officers, drove to Eddington's residence at 1417 Farwell. Neither Detective Shelby nor the police officers possessed a warrant for Eddington's arrest. Upon arrival Shelby observed a car, which he knew to be Eddington's, parked near the Farwell address. As he approached Eddington's apartment, Shelby observed foot and heel prints in freshly fallen snow leading to the apartment. On close examination, Shelby noticed that these prints were similar to those which he had seen at the Middledorf residence. No such prints were observed leading away from Eddington's apartment door. Detective Shelby testified that, at this moment, he was convinced that Eddington had committed the Middledorf murders.

Shelby then approached the apartment door and heard the rustle of more than one person in the

apartment. "At least I seem—it appeared to me that there was more than one person in the house, the apartment." A knock on the door produced no immediate response. A female voice then asked who was there. Shelby identified himself and asked if "Billy" was home. He was told that Eddington had left the apartment that evening at 10 p.m. Detective Shelby and the officers turned to leave in order to discuss whether to stake out the house, break the door, or to procure an arrest warrant. As the officers were leaving, the female inside Eddington's apartment said, "Mr. Shelby, is that you?" Detective Shelby again identified himself. Thereafter, a female came to the door, identified by Shelby as Johnetta Hawkins, Eddington's girlfriend, whom Shelby had known for some time. Miss Hawkins repeated that Eddington was gone; however, Detective Shelby—not totally relying on the representation that Eddington was absent—asked if he could look around. Miss Hawkins opened the door and told Shelby to go right ahead. Detective Shelby then drew his gun and entered the apartment.

Detective Shelby described his subsequent conduct as follows:

"*Q.* After you said you wanted to look and see for yourself what did you do?

"*A.* I went—first I turned to the left. I went to the living room on into the bedroom, looked under the bed, as I was going through the closet there is a connecting closet between the bedroom and smaller bedroom I would call it or utility room. I noticed a pair of black shoes setting there. I was looking in the closet to see if Eddington could have hidden in there.

"*Q.* Was he in there?

"*A.* No, sir. I picked the shoes up, examined them, saw that they were the heel was similar to the one I had seen outside, and the heel was the char-

acteristic of the one as the Middledorf one in the bathroom where Mrs. Middledorf was found. I also saw fine particles which I thought could have been glass in them. I set the shoes down, come on back through the small bedroom into the kitchen and told Lieutenant Killingsworth he is not here, let's go."

The officers then left the apartment to discuss what should be done. A police car was called to the scene to wait in the vicinity until the prosecutor could procure orders for warrants. Detective Shelby appeared before a magistrate and obtained a warrant for Eddington's arrest and a search warrant for the shoes observed in Eddington's apartment. The officers returned to the apartment and found Miss Hawkins had left and had padlocked the door. They obtained entry by forcing the door and took possession of the shoes.

Eddington was arrested on February 8th and charged with the murders of Carl and Gertrude Middledorf. Before trial, defense counsel filed a timely motion to suppress people's exhibit 2, the pair of shoes taken from Eddington's apartment. This motion was denied following an evidentiary hearing. At trial, the people introduced into evidence both the shoes and pictures of heel prints and impressions made from the shoes by the state police. This evidence, together with testimony that similar prints were found at the scene of the crime, tended to show that defendant was the perpetrator of the alleged murders.

I

Defendant first contends that the admission of people's exhibit 2 as evidence against him was constitutional error. He alleges that Detective Shelby's examination of the shoes at the time of Shelby's original entry into defendant's apartment consti-

tuted an illegal search in violation of his rights under the Fourth Amendment, as applied to the States through the Fourteenth Amendment, of the United States Constitution. See *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684; 6 L Ed 2d 1081; 84 ALR2d 933).

At the outset, we note that consideration of defendant's constitutional claim is not obviated by the fact that Detective Shelby obtained a warrant to search for defendant's shoes *after* having discovered them in defendant's apartment. If, as defendant contends, Detective Shelby's action in lifting the shoes and examining their heels constituted an illegal search, the subsequent seizure of the shoes pursuant to a warrant would, on this record, be the "fruit of the poisonous tree," thus subject to the exclusionary rule. See *Silverthorne Lumber Company, Inc.* v. *United States* (1920), 251 US 385 (40 S Ct 182; 64 L Ed 319); *Wong Sun* v. *United States* (1963), 371 US 471 (83 S Ct 407; 9 L Ed 2d 441). For it clearly appears from the record that the subsequent warrant was issued based on knowledge obtained as a result of Shelby's examination of the shoes. And, assuming the illegality of that examination, evidence obtained by use of the tainted warrant must be excluded at trial. *Mapp* v. *Ohio, supra; People* v. *Alverson* (1924), 226 Mich 342. To hold otherwise would permit the police to ignore completely the constitutional requirement of a search warrant. It would allow them to engage in unlawful searches at will, being assured that if they discovered incriminating evidence, they could thereafter cure their illegal actions by securing a search warrant. Such is not our conception of the Fourth Amendment. We therefore confine our consideration of defendant's constitutional claim to Detective Shel-

by's original entry into defendant's apartment and his examination of defendant's shoes.

In denying defendant's motion to suppress, the trial court found that Detective Shelby had probable cause to arrest defendant for armed robbery prior to going to defendant's apartment. The court also found that, upon arrival at the apartment and after observing the prints embedded in the snow, Shelby likewise had probable cause to arrest defendant Eddington for the Middledorf murders. These findings are not contested by defendant on appeal. The trial court then reasoned:

"Arrests without a warrant are valid if based on 'probable cause' or 'reasonable grounds.' Under the circumstances, both at common law and by statute, *the officers were entitled to enter the apartment to make a lawful arrest of defendant Eddington.*" (Emphasis supplied.)

Defendant's threshold argument is that, notwithstanding the fact that Shelby possessed "reasonable cause to believe that a felony [had] been committed and reasonable cause to believe that [Eddington had] committed it," see MCLA § 764.15(d) [Stat Ann 1954 Rev § 28.874(d)], the entry into defendant's apartment without an arrest warrant was unreasonable and unlawful because the entering officers had no justifiable excuse for their failure to obtain a warrant.

A similar contention was presented to this Court in *People* v. *Herrera* (1969), 19 Mich App 216, and we rejected it saying:

"Upon consideration of US Const, Am 4, and Const 1963, art 1, § 11, we find no valid basis for the adoption of defendant's cited standard for reasonableness regarding searches as the standard to be applicable to arrests." 19 Mich App at 223.

The Court noted that numerous courts hold that an arrest without a warrant is not unlawful even though the police have adequate opportunity to obtain an arrest warrant prior to the arrest.

Nor are we of the opinion that defendant's absence in fact from the apartment affected the lawfulness of Detective Shelby's entry. Upon approaching the apartment, Shelby heard what appeared to be the rustle of more than one individual inside the apartment. He had previously seen defendant's car parked outside the apartment. These circumstances led him to believe that Eddington was at home. That belief was on this record a reasonable one, and, although Detective Shelby was informed that defendant was not at home, he was not required to rely on Miss Hawkins' representation. *Accord, People v. Sprovieri* (1968), 95 Ill App 2d 10 (238 NE2d 115), *affirmed* (1969), 43 Ill 2d 219 (252 NE2d 531). Having probable cause to arrest defendant and having a reasonable belief that defendant was at home, we conclude that Shelby was entitled to enter the apartment and was lawfully on the premises. *Accord, People* v. *Barbee* (1966), 35 Ill 2d 407 (220 NE 2d 401); *State* v. *Howard* (1968), 274 NC 186 (162 SE2d 495); *People* v. *Sprovieri, supra.*

Defendant next suggests that, assuming *arguendo* that the officers had a right to enter the apartment to search for defendant, they did not have the authority to search for evidentiary items. Detective Shelby's conduct is characterized as a "search incident to an attempted arrest," which, defendant argues, has been universally rejected by the courts. Two authorities are cited and said to undermine the lawfulness of Detective Shelby's conduct. They are *Mosco* v. *United States* (CA 9, 1962), 301 F2d 180, and *Stoner* v. *California* (1964), 376 US 483 (84 S Ct 889; 11 L Ed 2d 856). Both decisions are distin-

guishable, however, from the facts of the instant case.

In *Mosco* v. *United States, supra,* officers entered an apartment with the intent, supported by probable cause, to arrest the defendant. The issue presented was stated by the court at 186: *"Discovering appellant's absence,* was the [*warrantless*] search of the apartment and the seizure of the material evidence proper?"* (Emphasis supplied.) Likewise in *Stoner,* officers proceeded to search an apartment *after* they found defendant was not present. Here, however, Detective Shelby first observed the shoes in the course of a lawful search for defendant Eddington, reasonably believed by Shelby to be hiding in the apartment. Unlike the situation in the cases cited by defendant, the search for the suspect here had not ended. We need not consider, therefore, the validity of a search for evidentiary items following recognition by the police of a suspect's absence from the premises.

In *Harris* v. *United States* (1968), 390 US 234, 236 (88 S Ct 992, 993; 19 L Ed 2d 1067, 1069), the United States Supreme Court noted that:

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."

This is the so-called "plain view doctrine," which has been repeatedly applied by Michigan Courts. See *People* v. *Orlando* (1943), 305 Mich 686; *People* v. *Kuntze* (1963), 371 Mich 419; *People* v. *Tetts* (1967), 6 Mich App 254; *People* v. *McDonald* (1968), 13 Mich App 226; *People* v. *Tisi* (1969), 16 Mich App 316. The trial court, in ruling that defendant's shoes were admissible as evidence, relied on the doctrine here, considering it applicable to the facts presented. Defendant contends, however, that *Harris* has no

application, since all Detective Shelby could see at first glance was a pair of black shoes. Defendant asserts in his brief, "To see what he wanted to see, it was necessary for Shelby to pick up the shoes, turn them over, and carefully examine the heels."

Contrary to defendant's assertion, the facts presented at the evidentiary hearing support the conclusion that, immediately upon seeing the shoes, Detective Shelby recognized them as those worn at the scene of the crime. From his examination of the print at the Middledorf residence, Shelby knew that the shoes of the killer were "Stetson" shoes—a peculiarly shaped shoe. He had seen similar prints leading to defendant's apartment upon his arrival; no such prints were observed exiting the apartment —a situation warranting the conclusion that such shoes were inside the apartment. Under the circumstances, it is unlikely that it was necessary for Detective Shelby to pick up the shoes and examine the heels in order to see what he wanted to see.

Nevertheless we decline to rest on this ground. We think it necessary to consider on the merits defendant's contention that Detective Shelby's actions in picking up the shoes, turning them over, and examining them constituted a search in violation of the Fourth Amendment. We reach this question because Detective Shelby was never asked by the prosecution at the evidentiary hearing whether he recognized at first glance the shoes as those worn at the scene of the crime. The testimony is at best ambiguous. We therefore decline to apply the plain view doctrine here since the people have failed to meet *their* burden of proof. See *People* v. *Mason* (1970), 22 Mich App 595; *cf. State* v. *Kananen* (1965), 97 Ariz 233 (399 P2d 426).

The people contend, "surely lifting the shoes up was not a 'search.'" We agree.

In *United States* v. *Catanzaro* (SD NY, 1968), 282 F Supp 68, a postal inspector while lawfully in defendant's apartment noticed a Springfield rifle on a wall rack, and recalled from his investigation of defendant's alleged fraudulent use of credit cards the repair of such a rifle under a credit card. He examined the rifle more carefully and observed that the serial number on the rifle matched that of the one repaired through the use of the credit card. The rifle was seized as evidence. A motion to suppress the rifle was filed. It was urged that the inspector's action in closely examining the rifle constituted an unlawful search. Judge Weinfeld denied the motion to suppress, saying at 69, 70:

"The inspector and his companions were lawfully present in defendant's apartment * * * . Discovery of the rifle required no search * * * . The inspector was not precluded from observing what was clearly and plainly there to be seen. *Having seen the rifle, the inspector properly scrutinized it more carefully, thereby confirming his suspicions that it was part of the fruit of the alleged crime. That he was required to examine it more closely to identify the serial number did not transform a mere observation into an unconstitutional search.* '* * * mere observation [does not] constitute a "search." If an officer sees the fruits of crime—or what he has good reason to believe to be the fruits of crime—lying freely exposed on a suspect's property, he is not required to look the other way, or disregard the evidence his senses bring him.' " (Emphasis supplied.)

We apply similar analysis here. Having seen the pair of shoes during his lawful search for defendant and having good reason to believe that such shoes would, upon examination, prove to be those worn at the murder scene, we conclude that Detective Shelby properly scrutinized the shoes more care-

fully.   That Shelby was required to lift the shoes and examine the heels in order to identify them as evidence of crime did not transform his observations into an unconstitutional search.

A "search" in the constitutional sense implies a "prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way" *Weltz* v. *State* (Alaska, 1967) 431 P2d 502, 505.   Such a definition recognizes the gist of the protection afforded by the Fourth Amendment—protection of the individual from unreasonable invasion of privacy.

"We have recently held that 'the Fourth Amendment protects people, not places,' *Katz* v. *United States* (1967), 389 US 347, 351 (88 S Ct 507; 19 L Ed 2d 576, 582), *and wherever an individual may harbor a reasonable 'expectation of privacy,' id.* at 361 (Mr. Justice Harlan, concurring), *he is entitled to be free from unreasonable governmental intrusion." Terry* v. *Ohio* (1968), 392 US 1, 9 (88 S Ct 1868, 1873; 20 L Ed 2d 889, 899).   (Emphasis supplied.)

See also, *People* v. *McDonald, supra,* at 235.   And, in determining the parameters of personal privacy protected by the Fourth Amendment, not only place, but the type of information seized and, consequently, the means of intrusion, must be considered as relevant factors.   See note, "From Private Places to Personal Privacy: A Post-Katz Study of Fourth Amendment Protection," 43 NYUL Rev 968, 986 (1968).

Application of these principles here leads us to our view that Detective Shelby's action in lifting defendant's shoes and examining their heels did not constitute a search in the constitutional sense.   We find no "prying into hidden places for that which

is concealed." The shoes had not been hidden; nor were they intentionally put out of the way. Under the circumstances, it does not appear that defendant exhibited a subjective expectation of privacy as to his shoes. *Cf. People* v. *Bradley* (1969), 1 Cal 3d 80 (81 Cal Rpt 457, 459, 460 P2d 129, 131). Moreover, any such expectation would have been unreasonable. Our values are not adjusted to view the heels of shoes as within the province of intimate personal control.

Finally, it seems to us that the same result should be reached even on the hypothesis that a search was involved. The basic question to be answered is whether or not Shelby's lifting the shoes and examining their heels was unreasonable under all the circumstances.

"Where a warrant has not been obtained, the validity of the search depends on the law's appraisal of the reasonableness of the search, only unreasonable warrantless searches and seizures being barred." *People* v. *McDonald, supra,* at 232.

And see *People* v. *Gonzales* (1959), 356 Mich 247, 253; *People* v. *Zeigler* (1960), 358 Mich 355, 375; *People* v. *Herrera, supra.* On this record we hold Shelby's conduct to be reasonable in constitutional terms.

As previously indicated, Detective Shelby was lawfully in defendant's apartment. He reasonably believed defendant to be hiding in the apartment and had every right, supported by probable cause, to search for the suspected killer. Shelby's discovery of the shoes was not the result of a general search for evidence. Rather, the pair of shoes was seen during the course of the search for Eddington. In our view, Shelby's subsequent actions in lifting the shoes and examining their heels involved no more than "legitimate and restrained investigative con-

duct undertaken on the basis of ample factual justification." *Terry* v. *Ohio, supra,* at 13.  *Cf. People* v. *Herrera, supra; People* v. *Trudeau* (No. 6785, released to the parties February 26, 1970).  Finally, we reiterate the absence of any invasion of defendant's privacy.

In summary, we conclude that the trial court correctly denied defendant's motion to suppress people's exhibit 2.  The shoes were properly admitted into evidence.  In light of our conclusion, we need not consider whether Miss Hawkins' action in admitting the police into the apartment constituted a waiver of defendant's constitutional claim.

## II

At trial, again over defendant's objection, the people introduced into evidence five colored photographs of the corpses of Carl and Gertrude Middledorf.  The pictures detail the condition of the victims' bodies as the police found them.  On appeal, defendant contends that admission of the photographs was reversible error.  It is argued that the photographs could shed no light upon any material point in issue.  See *People* v. *Becker* (1942), 300 Mich 562, 565.  Furthermore, defendant contends that the gruesome nature of the photographs could only prejudice and inflame the jury, and that any probative value of the photographs was clearly outweighed by their prejudicial effect.  See *People* v. *Turner* (1969), 17 Mich App 123.

We hold that the photographs were admissible.  The scenes depicted were helpful in throwing light on a material issue—namely, the malice with which the crimes were committed.  The people had charged that defendant feloniously, wilfully, and with malice aforethought did kill and murder Carl and Gertrude Middledorf.  The photographs, detailing the nature

and extent of the wounds inflicted, were admissible for purposes of clarifying and illustrating testimony relating to the victims' appearance and condition, and particularly for purposes of substantiating the people's theory concerning the atrociousness of the crimes, or the malice with which they were committed. See Annotation, 73 ALR2d 769, 831. *Cf. People* v. *Bergin* (1969), 16 Mich App 443.

*People* v. *Turner, supra,* upon which defendant relies, is distinguishable from the present case. The photographs there involved depicted "the corpse as it is left, not by its assailant, but by the probing instruments and procedures of the medical examiner." 17 Mich App at 132. Moreover, "photographs taken during an autopsy however, must be subjected to more careful scrutiny." *Id.* In the present case, the gruesome nature of the photographs is not the product of an intervening medical examiner. The photographs depict the bodies of the victims as left at the scene by the assailant.

The question of the admissibility of photographs objected to as prejudicial and inflammatory is within the discretion of the trial judge. *People* v. *Brannon* (1968), 14 Mich App 690; *People* v. *Bergin, supra; People* v. *Turner, supra.* Finding no clear abuse of this discretion under the facts and circumstances of this case, we conclude that the photographs in question were properly admitted.

### III

At trial, defendant testified in his own behalf and denied killing the Middledorfs. His defense was alibi. It was defendant's testimony that on the evening of February 3, 1967, the date of the alleged homicides, he was present in his apartment with Johnetta Hawkins. Thus the ultimate question of guilt turned largely upon the jury's view of defend-

ant's credibility. An allegedly improper effort by the people to impeach defendant's credibility constitutes defendant's third assignment of error.

At the time of trial, defendant had several charges pending against him, including charges that he had murdered Dr. Archer Claytor and his wife. Before calling defendant to testify in his own defense, Eddington's counsel sought a ruling from the trial court as to whether it would permit the people to use the pending murder charges on cross-examination for impeachment purposes. Defense counsel took the position that any reference by the people to the murder charges would, under the circumstances, be so highly prejudicial as to far outweigh any probative relevance of the pending charges to the issue of credibility. After hearing argument, the trial court decided that it would allow cross-examination with respect to the pending murder charges. The prosecutor was advised by the court, however, that he was to proceed at his own risk, since the court itself considered the prosecutor to be on tenuous grounds in pursuing such cross-examination. Thereafter, defendant took the stand and he was asked on direct examination whether any charges were pending against him. Defendant responded in the affirmative: "Well, I have four or five charges pending."

On cross-examination, the following testimony was elicited by the prosecution:

"*Q.* Now, Mr. Brisbois [defense counsel] asked you if you were—if there were any charges pending against you at the present time and you answered yes.

"*A.* Yes.

"*Q.* And it is a fact that you are also charged in a double murder other than the one that we have at the present time?"

Defense counsel immediately objected. The trial court, apparently relying on its earlier ruling, overruled the objection and permitted the prosecutor to repeat the question.

"*Q.* In fact, you do have two other double murders other than the case at bar pending against you in the circuit court; is that correct?

"*A.* I am charged with another one, yes."

The people attempt to sustain the foregoing cross-examination by referring to *People* v. *Hoffman* (1965), 1 Mich App 557. In *Hoffman,* it was held that questions about pending charges could be asked, but only in the discretion of the trial judge. Here the trial judge left the decision concerning use of the pending charges to the prosecutor. As a result, it cannot be said that the ruling of the trial court constituted an exercise of discretion. Under these circumstances, reliance by the people on *Hoffman* is misplaced.

Since the prosecutor was warned that he was to proceed at his own risk in using the pending murder charges for impeachment purposes, we conclude that what was said by this Court in *People* v. *Brocato* (1969), 17 Mich App 277, applies here and necessitates reversal. We noted at 302, 303:

"Where credibility is the only issue, the probative value of arrests and charges, unsubstantiated by a conviction, is slight at best. When weighed against the great danger that the jury, despite careful instructions, might misapply such evidence, the scales of justice tip in favor of exclusion." (Citation and footnotes omitted.)

In terms of the probable impact upon the minds of the jury, the danger here of prejudicial effect was manifest and overwhelming. Evidence that defendant had also been charged with a second double mur-

der could only suggest to the jury that defendant's career included repeated assaults upon human life. We share the trial court's view that the prosecutor was on tenuous grounds in employing the pending murder charges for impeachment purposes. Defendant was entitled to have his guilt or innocence of the Middledorf homicides determined on the specific offenses charged. He was not required to risk the possibility of conviction for a series of unproven prior acts which collectively suggested that his career had been reprehensible.

Nor are we persuaded that since defense counsel questioned Eddington concerning the pending charges on direct examination, defendant is in no position to complain. Defense counsel's questions hardly extended as far as the prosecutor's cross-examination. The questions posed merely concerned the number of pending charges, not their nature. In an area involving factors so highly prejudicial—here the nature of the charges—a slight opening of the door by the defense should not permit the prosecution to swing it totally ajar. See *United States* v. *Beno* (CA 2, 1963), 324 F2d 582, 588. Moreover, defense counsel only brought out the pending charges knowing full well that the people would be permitted to question defendant concerning the murder charges on cross-examination. This maneuver does not, however, open the door to the prejudicial cross-examination that took place. *Cf. People* v. *Hines* (1967), 87 Ill App 2d 283 (232 NE2d 111).

We hold that admission of the pending murder charges for impeachment purposes was error. Furthermore, we are satisfied that the improper admission of such evidence resulted in a miscarriage of justice. MCLA § 769.26 (Stat Ann 1954 Rev § 28.1096). The question of Eddington's credibility was critical, and, on this record, we decline to char-

acterize the improper impeachment of defendant's credibility as harmless error. This is especially true here, since defendant was subsequently acquitted of the charges of murdering the Claytors.

Other questions raised by defendant need not be considered, as they are likely upon retrial to emerge in a greatly altered context of evidence.

Defendant's conviction is reversed and the case is remanded for new trial.

All concurred.