STATE of North Dakota, Plaintiff
and Appellee,

v.

Denise N. OHNSTAD, Defendant
and Appellant.

Cr. No. 985.

Supreme Court of North Dakota.

Dec. 19, 1984.

Robert G. Hoy, State's Atty., Fargo, for plaintiff and appellee; argued by Robert G. Hoy, State's Atty., Fargo.

Lanier, Knox & Olson, Fargo, for defendant and appellant; argued by Frank L. Racek, Fargo.

ERICKSTAD, Chief Justice.

A grand jury issued an indictment charging that Denise N. Ohnstad, on or about November 3, 1982, committed the crime of manslaughter or, in the alternative, negligent homicide, in that she recklessly or negligently caused the death of a six-month-old child, Shannon Leigh Ohnstad, "by unknown means sufficient to cause a severe head injury which resulted in her [Shannon's] death." After a six-day trial the jury returned a verdict finding Ohnstad guilty of negligent homicide. She was sentenced by the court to three years imprisonment in the North Dakota State Penitentiary, with all but thirteen months of the sentence suspended subject to supervised probation. Ohnstad appeals from the jury's verdict and the judgment of conviction. We affirm.

Ohnstad has raised several issues concerning errors she alleges occurred during her trial:

    I.  Did the trial court err in denying defendant's motion for judgment of acquittal?

    II.  Did the trial court err in admitting testimony concerning a statement made by the defendant that she had, on one occasion prior to November 3, 1982, bitten Shannon on the cheek?

    III.  Did the trial court err in admitting color slides depicting the child's skull during an autopsy?

    IV.  Did the trial court err in admitting "cumulative, non-expert" opinion testimony into evidence regarding the extent and possible cause of Shannon's injury?

    V.  Did the trial court err in not determining the prejudicial effect on the jury of an article published in a local newspaper concerning the trial?

    VI.  Did the trial court err in refusing to give the defendant's requested jury instructions concerning the definitions of "culpable negligence" and "negligently"?

*Facts*

Shannon Ohnstad was placed for adoption in the Fargo home of James and Denise Ohnstad on October 22, 1982. On Wednesday, November 3, 1982, at approximately 3:40 p.m., Helen Fennell, a dispatcher for an ambulance service, received a telephone call from a frantic and crying Denise Ohnstad who said, "My baby is not breathing, I think she's dying!" Fennell testified that she told Ohnstad how to perform cardiopulmonary resuscitation on the child: "I counted with her to keep her going and she [Ohnstad] kept saying, 'If Shannon dies, it's all my fault. I have been so mean to her.'"

An ambulance transported Shannon from the Ohnstad home to the emergency room of Dakota Hospital. There she was treated by Dr. George Leher, a pediatrician, who observed that although Shannon was breathing on her own, her blood count was low and her neurological status was not normal and appeared to be deteriorating. Several minutes later, Dr. Leher observed a considerable amount of swelling on the right side of Shannon's head. At trial, Dr. Leher opined that the swelling had occurred secondary to an injury of recent nature, most probably within one hour prior to Shannon's hospitalization. X-rays taken at the direction of Dr. Leher revealed the presence of an extensive fracture of the occipital (back) and right parietal (side) bones of the child's skull. Because a strong possibility existed that Shannon was bleeding inside her head, Dr. Leher referred the child to a neurosurgeon, Dr. Charles Koski.

Shannon was transported to St. Lukes Hospital where a neurological examination, and other testing including a CAT scan and additional skull X-rays, indicated to Dr. Koski that Shannon was also suffering from a rather severe injury to her brain and rather severe brain swelling. Dr. William Norberg, a pediatrician, supervised the treatment of Shannon with Dr. Koski. Dr. Norberg described at trial Shannon's skull X-rays as depicting "a very extensive branch-

ing skull fracture in the occipital area and with an extension which we call a running fracture which means that it branched out and extended beyond to involve a very large portion of the skull." Dr. Norberg also described Shannon's injury as "very severe, extremely severe form of head injury and of an extreme magnitude."

Shannon died on November 16, 1982. An autopsy was performed the following day by Dr. Richard Leech, a neuropathologist, who described Shannon's fracture as very extensive and complex. Dr. Leech concluded that Shannon suffered catastrophic neurological damage at the time she sustained the skull fracture and further opined that such damage, more likely within a matter of minutes, resulted in brain swelling. Dr. Leech testified that the immediate cause of Shannon's death was brain swelling and compression of vital structures at the base of the brain and brain stem.

Ohnstad testified that she was home alone with Shannon on the afternoon of Wednesday, November 3, 1982. The following is a summary of Ohnstad's testimony concerning events of that afternoon. Sometime between 2:00 and 2:30 p.m., Ohnstad put Shannon in her crib for a nap. At approximately 3:00 p.m., she picked Shannon up because Shannon had been crying, was very irritable, and would not take a nap. Shannon was fed just prior to being put down for her nap and her diapers were clean. She was taken downstairs to the family room of the Ohnstad home where she continued to cry, whine, and fuss, despite Ohnstad's efforts to appease her for thirty to forty-five minutes by placing her in a swing, then a walker, by trying to interest her in various toys, and finally by walking her around the rooms of the house. This process of walking around the house had quieted Shannon on past occasions. Ohnstad then placed Shannon on the floor of the family room in a kneeling position in front of the fireplace, and went upstairs to the kitchen to feed the family cats. Ohnstad took a drink of water and at that moment she heard a "thud," and returned downstairs to the family room where she found Shannon lying on her back near the

fireplace. She picked Shannon up, took her upstairs to the bathroom where Shannon arched her back and threw her arms up; "her eyes were moving around."

The State's theory of the case as argued to the jury is revealed in its cross-examination of Ohnstad:

"Q. [By Mr. Hoy] ... Is it fair to state that after the hour to hour 45 minute time period when Shannon had been crying, had been fussy and you had tried your best to make her stop crying, that you were beginning to lose your patience and becoming frustrated with her because of her continual crying?

"A. Maybe somewhat.

"Q. It is possible, Mrs. Ohnstad, that at the time that you put her in the family room, you were becoming frustrated to the point you may have placed her on the ground with some amount of force?

"A. No sir."

While Shannon was hospitalized, Ohnstad conversed with various hospital personnel and others. Gwen Kraft, a medical social worker, testified that she spoke with the Ohnstads in the emergency room area of Dakota Hospital the day Shannon was brought in. Kraft testified that Ohnstad "admitted that it [the child's crying and being fussy] was getting to her but that she had not spanked the baby." Ohnstad also said she "shouldn't have left the baby alone for a minute."

Sharon Miller testified that she was seated across from the Ohnstads in the intensive care waiting room at St. Lukes on November 3, and heard Denise Ohnstad say two or three times to James, "If only I wouldn't have left the baby to feed the damned cats."

On the following day, November 4, 1982, Ohnstad spoke with Wayne Allard, a pediatric social worker at St. Lukes, and told him that on one occasion she had bitten Shannon on the cheek:

"A. She informed me that she had not intentionally harmed the child. And she also indicated to me or to us that she wanted to be completely honest, that this

had been a very difficult baby to care for ever since it had come into her home, and that on one occasion she was quite frustrated and angry and had bitten the child on the cheek.

"Q. Was she, did she provide you any additional specifics about how the child had been difficult to care for in her home?

"A. Just that the baby had been very fussy and whiny and that it was hard to settle her down. She also volunteered that she felt very bad about the biting incident.

*     *     *     *     *     *

"Q. Did you get any indication from her as to why it had occurred?

"A. As I recall as we talked about this particular topic, she made reference back to the fact that the baby had been very difficult to care for right from the time they received the baby out of foster care in the Bismarck area. Even on the return to Fargo the baby had been extremely fussy and very hard to settle down."

Ohnstad testified that she made the statements attributed to her by Helen Fennell and Wayne Allard. She testified that on Monday, November 1, 1982, while attempting to change Shannon's diaper, the child began to cry. Shannon usually did cry when placed on her back for a diaper change, however, in the past she would stop crying "as you would pick her up." Ohnstad testified that in this instance Shannon did not stop crying and that she "nipped her [Shannon] on the cheek."

Ohnstad took a leave of absence from work after she and her husband received Shannon. James testified that he made a special effort most days to get home to see Shannon during his lunch hour but could not do so on two or three occasions, including the day the biting incident occurred and the day Shannon was injured.

Photographs which fairly and accurately depict the general layout of Ohnstad's family room were admitted into evidence. They show a fireplace which, according to James, is made of brick; the hearth is twelve inches and the mantel five feet above the floor. James testified that the family has five Siamese cats that could jump up on the fireplace mantel. The floor of the family room is made of concrete, covered with rubber backed carpeting. A coffee table, approximately eighteen inches high, is located near the fireplace. James testified that during the evening on the day Shannon was hospitalized he saw the family room and observed that the coffee table was a little closer than normal to the fireplace hearth, but otherwise nothing else was out of place or damaged including various knickknacks and other items that were kept on the fireplace mantel.

James testified that Shannon was quite strong in her upper arms and shoulders, could crawl at a rapid rate, and "could pull herself, if she had something to grab a hold of, up to a standing position." He testified that Shannon could pull herself up to a sitting position by pulling at rings located on the side of the coffee table and could pull herself to a standing position beside the fireplace hearth. Both James and Denise testified that Shannon could not walk or stand unaided nor had they ever seen her pull herself to the top of the hearth or coffee table.

At trial, testimony was elicited from Doctors Leher, Koski, Norberg, Leech and a defense witness, Dr. Garry Peterson, a pathologist and assistant medical examiner of Hennepin County, Minnesota, regarding their opinions as to the degree of force necessary to cause the injury sustained by Shannon.

Dr. Leher testified that Shannon's injury would require a serious blow: "[T]he child would either have to be struck by something or the child would have to fall from some height in order to create a skull fracture of this severity with resultant brain swelling." He testified that the most probable explanation for the injury was that Shannon's head struck a hard flat surface, the carpeted floor or a non-padded surface. When shown photographs of the family room, Dr. Leher said, "I would have diffi-

culty trying to develop a scenario in which a six-month old child, developmentally precocious [capable of pulling herself to a standing position] ..., could injure herself in the manner in which Shannon Ohnstad appeared to be injured in this room." When asked whether he had an opinion to a reasonable degree of medical certainty whether or not Shannon's injury would be caused by the child falling from a standing position on the floor headlong into the fireplace hearth, Dr. Leher responded, "Its possible but highly improbable." As to what he meant by the words "highly improbable," Dr. Leher said, "I do not feel that the force sustained by such a fall would ordinarily be adequate to produce these injuries."

Dr. Leher testified that "its possible, not as improbable as if the child is standing on the floor but still improbable" that a fall from a standing position on top of the coffee table, assuming Shannon could have placed herself in such a position, into the fireplace hearth would cause the injury she sustained. He also testified that "its possible, but improbable" that a fall from a standing position on the fireplace hearth, assuming again that Shannon could have placed herself in such a position, headlong to the floor would have caused her injury.

Dr. Koski was also asked by the State to assume that Shannon might have fallen from various areas in the family room and whether he had an opinion to a reasonable degree of medical certainty whether or not each fall would cause the injury she sustained. We will briefly review his testimony. A fall from a standing position into the fireplace: "I don't see how she could get up enough velocity and momentum to produce the energy force that would be required to fracture her skull in the fashion that it was done." A fall from a standing position on the fireplace hearth to the floor: "Possible but not probable." A fall from a standing position on the coffee table onto the fireplace hearth: Possible but not over the line of probability. A fall from a standing position on the floor to the floor: "[T]his is the least likely of the three choices you gave me." In explaining his

testimony Dr. Koski said that "there's always the possibility that anything can occur at any given time in medicine." "By probability ... I'm arbitrarily saying there is a 50 percent chance or better that it could occur and that is when I say it's probable." On cross-examination Dr. Koski was asked to assume that a five to six pound cat jumped from the fireplace mantel striking Shannon and toppling her over to the floor. Dr. Koski responded that the probability that Shannon's injury would occur under such circumstances would increase "into the realm of probability," a "50–55 percent chance."

Dr. Norberg testified that assuming a cat jumped from the mantel and knocked Shannon to the floor "the injuries are possible to occur but are extremely unlikely that they would have occurred." As for any of the other hypothetical falls, Dr. Norberg did not believe Shannon's injury could occur. He said:

"The type of fracture and injury to the brain itself were those that we see in a fall from excessive height or that occur in an auto accident and are rarely seen even in a child of this age when they fall down a basement stairs onto a concrete floor. And so all of the injuries that appeared to be of this magnitude have with them associated a great deal of force or height or things that are of a greater magnitude than the hypothetical questions which you asked me."

Dr. Norberg testified that "it is very possible for any adult to cause this severe of injury to a child either inadvertently or advertently."

Dr. Leech testified that Shannon's injury was a "recent abnormality." In examining the skull fracture, the neuropathologist was able to determine that there was no evidence of healing and that the fracture could not have occurred prior to November 3, 1982. He testified that two likely points of impact were directly over the child's right ear and on the back of the head. Dr. Leech was also asked the hypothetical questions concerning whether or not the

various falls would cause Shannon's injury. A fall from a standing position on the floor to the floor: "Not within my experience, no." A fall from a standing position on the floor onto the hearth: "I suppose its conceivable. In my experience, no. And based on observations in this case, had she fallen on the hearth, I most certainly would have expected much more bruising than was evident at the time of autopsy." A fall from a standing position on the hearth to the floor: "I suppose its conceivable, but again not within my experience." A fall from a standing position on the coffee table onto the hearth or floor: "[I]ts possibly conceivable but I don't find it the least bit plausible."

In explaining his testimony, Dr. Leech said that he had not seen the type of injury sustained by Shannon "except in situations in which there was documented evidence of far more trauma than you have raised." Presented with the cat hypothetical, Dr. Leech responded, "I would concede the possibility. The 50–50 chance [probability described by Dr. Koski] I find rather imaginative." When asked whether a human being is capable of exerting a force or energy upon a child sufficient to cause the injuries found in Shannon at autopsy, Dr. Leech responded yes, "I have seen infants of this age and younger assaulted by adults that have killed them."

The defense witness, Dr. Peterson, examined the autopsy report on Shannon and testified that Shannon's injury was indicative of a moving head hitting a fixed object rather than a blow to the head. He testified that given the "precocious" nature of Shannon at her age, she was perhaps more susceptible to injury because such children have very poor balance. Dr. Peterson was also asked the hypothetical questions. A fall from a standing position on the floor to the floor: "In my opinion its remotely possible, I don't think very likely." A fall from a standing position on the floor onto the fireplace hearth: Possible, "More likely than the first scenario." A fall from a standing position on the hearth to the floor: "[Y]es, ... an injury of that type could be suffered." A fall from a standing position on the floor caused by a cat jumping from the fireplace mantel: "More likely than not." Dr. Peterson testified that a human being could exert a force sufficient to cause the type of injury sustained by Shannon.

"Q. So, Dr. Peterson, if we took a baby and laid her in the center of the floor, assuming this floor to be like the Ohnstads' floor, and a person were to grasp the child and smack its head on the floor like that, striking in the ear, this would cause that type of injury, would it not?

"A. Could very well cause that, yes."

### Motion for Judgment of Acquittal

█ Ohnstad contends the trial court erred in denying her motion made at the close of the State's case for judgment of acquittal, on grounds the State offered no evidence as to culpability or an affirmative act on her part which caused Shannon's death. She asserts the only evidence offered at trial was that she "left her child alone for a few moments in the family room while she went upstairs to feed her cats," and argues the jury was allowed to merely speculate as to her guilt on the basis of medical testimony "that Shannon's injuries were possible from a fall but unlikely."

Under Rule 29(a), N.D.R.Crim.P., a motion for a judgment of acquittal is properly granted only if the evidence is insufficient to sustain a conviction of the offenses charged. The standards articulated by this Court in reviewing challenges to the sufficiency of evidence properly recognize the distinctive role of the trier of fact whose function it is to weigh the evidence, to draw justifiable inferences of fact, and to determine the credibility of witnesses in determining guilt or innocence.

█ Our duty is to sustain a criminal conviction based upon a jury verdict if, upon reviewing the evidence in a light most favorable to the verdict, we determine that there is substantial evidence to support it. *State v. Halvorson*, 340 N.W.2d 176, 178

(N.D.1983); *State v. Allen,* 237 N.W.2d 154, 161 (N.D.1975). When reviewing the denial of a motion for judgment of acquittal, this Court may look at the entire record to determine if the evidence is sufficient to sustain the conviction. *State v. Shipton,* 339 N.W.2d 87, 89 (N.D.1983); *State v. Allen, supra,* at 159.

■■■ The evidence upon which the jury returned its verdict in this case was entirely circumstantial. A verdict based upon circumstantial evidence, however, carries the same presumption of correctness as other verdicts and will not be disturbed unless wholly unwarranted. *State v. McMorrow,* 286 N.W.2d 284, 286 (N.D. 1979); *Allen, supra.* A conviction may be justified on circumstantial evidence alone if it is of such probative force as to enable the trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. *State v. Hilsman,* 333 N.W.2d 411, 413–14 (N.D.1983); *State v. McMorrow, supra,* at 286–87. Our role as an appellate court is to merely *review the record to determine if there is competent evidence that allows the jury to draw an inference reasonably tending to prove guilt, and fairly warranting a conviction. State v. Hilsman, supra,* at 414. Upon appeal to this Court, it is the defendant's burden to show that the evidence, when viewed in the light most favorable to the verdict, reveals no reasonable inference of guilt. *State v. Lawenstein,* 346 N.W.2d 292, 293 (N.D. 1984).

■■■ A person is guilty of negligent homicide "if he negligently causes the death of another human being." § 12.1-16-03, N.D.C.C. The degree of culpability involved—"negligently"—is defined in Section 12.1-02-02(1)(d), N.D.C.C. A person engages in conduct

"d. 'Negligently' if he engages in the conduct in unreasonable disregard of a substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct."

Under these definitions there is no need for evidence to exist from which it can be inferred "that the defendant *realized* her conduct would in all probability produce death" as Ohnstad argues. Our code distinguishes negligent conduct from reckless conduct by requiring only an "unreasonable disregard of a substantial likelihood of the existence of the relevant facts or risks" for negligent conduct, in comparison with the requirement of "conscious and clearly unjustifiable disregard of a substantial likelihood of the existence of the relevant facts or risks" [§ 12.1–02–02(1)(c), N.D. C.C.] for reckless conduct. "The major difference is that the negligent person need not be aware of the likelihood that he is engaging in the prohibited conduct." Vol. I, *Working Papers of the National Commission on Reform of Federal Criminal Laws,* at 127 (1970).[1] *See State v. Trieb,* 315 N.W.2d 649, 657 (N.D.1982) [The focus of the definition of "recklessly" is upon a high degree of risk of which the actor is *actually aware.*].

■■■ Inadvertence to risk is the basis upon which condemnation for negligence proceeds, properly limited to cases where the actor is grossly insensitive to the interests and claims of other persons in society. ALI Model Penal Code and Commentaries, Part II, § 210.4, Comment on Negligent Homicide at 81, 87 (1980).

The following discussion in the Working Papers of the proposed Federal Criminal Code is also enlightening:

"Aside from the distinction drawn between recklessness and negligence on the basis of awareness, the formulations allow a jury to conclude that although the defendant was conscious of a risk, the nature and extent of the risk or the manner or degree of the defendant's disregard of it or the reasons for his disregard of it indicate that he was not reck-

---

1. Our Criminal Code is modeled after the proposed Federal Criminal Code which, in turn, relies heavily on the ALI Model Penal Code.

*State v. Trieb,* 315 N.W.2d 649, 657 n. 9 (N.D. 1982). References to both codes are made when appropriate.

less, but only negligent. Since all of these elements are relevant to the question whether a person was reckless or entirely without fault, it should be possible to reach the middle ground of negligence on the same basis." Vol. I, *Working Papers of the Nat'l Comm. on Reform of Fed'l Criminal Laws*, at 128.

▮ Ohnstad argues that at the trial court level, circumstantial evidence must be conclusive and must exclude every reasonable hypothesis of innocence. While this is the rule for guidance of the trial court it is not the rule for the guidance of the appellate court. The rule which we follow was originally adopted in *State v. Carroll*, 123 N.W.2d 659 (N.D.1963), where this Court quoted from 24A C.J.S. *Criminal Law* § 1882, as follows:

"While a case based on circumstantial evidence should be scanned with caution, the fact that the evidence is circumstantial and conflicting does not alone empower the appellate court to weigh it or determine its sufficiency, if it reasonably tends to prove the guilt of accused and fairly warrants a conviction. The question is whether there is evidence to support the verdict; and a verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed unless wholly unwarranted, even though the evidence is weak and unsatisfactory to the appellate court. The reviewing court is not required to explain the process by which the jury arrived at their determination.

"Where the circumstances are consistent with the hypothesis of accused's innocence as well as with that of his guilt, the jury, or the trial court trying the case without a jury, must draw the inference, and an appellate court will not substitute its judgment for that of the jury or of the trial court. This rule should not be confused with the rule laid down for the guidance of the trial court * * * that the evidence must be of a conclusive character and must exclude every reasonable hypothesis of innocence. * * *" 123 N.W.2d at 669.

We do not agree with Ohnstad's contention that no evidence exists connecting her in any way with the injury sustained by Shannon.

▮ In reviewing the evidence in a light most favorable to the verdict we conclude that there exists substantial evidence that the jury could reasonably have relied upon to draw an inference tending to prove Ohnstad's guilt, and fairly warranting her conviction. We cannot find that the trial court erred in denying the motion for judgment of acquittal in light of evidence which discloses: that Ohnstad was home alone with Shannon at a time when Shannon sustained a blow to her head of sufficient force to cause an extensive skull fracture and severe injury to her brain; that according to expert medical testimony, Ohnstad's explanation, that she momentarily left Shannon on the floor of the family room only to return to find the child injured, was inconsistent with the severity of the injury Shannon sustained; that Shannon, being only six months old, could not walk or stand unassisted or pull herself to the top of any of the furniture or furnishings in the family room of the Ohnstad home; that none of the various items on the fireplace mantel were out of place or damaged to indicate that a cat may have jumped from the mantel striking Shannon and toppling her over onto the floor; and that expert medical testimony indicated that an adult could exert a force upon a child sufficient to cause the type of injury Shannon sustained.

We will now consider the remaining issues presented for our review.

### Biting Incident

Ohnstad contends that the trial court erred in admitting testimony regarding the biting incident which occurred on November 1, 1982, in "direct defiance" of our decision in *State v. Stevens*, 238 N.W.2d

251, 257–59 (N.D.1975), and Rule 404(b), N.D.R.Ev.

Rule 404(b), N.D.R.Ev., reads as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Rule 404(b) is basically a formal recitation of the prior existing rule we discussed in *State v. Stevens, supra,* at 257, "that evidence of prior acts or crimes cannot be received as evidence unless it is substantially relevant for some other purpose than to show a probability that a defendant committed a crime charged because he is a man of criminal character." *State v. Forsland,* 326 N.W.2d 688, 691–92 (N.D.1982).

In *Stevens,* the defendant was convicted of causing the death of a two-year-old child by beating. The evidence was circumstantial. It consisted of evidence as to the injuries from which the child died, a showing that the injuries could have occurred during an eight-hour period when the defendant had charge of the child and three other children, and that the child had suffered prior injuries during other periods of time when the defendant was present and the mother of the child was not. The State, however, also presented evidence of prior injuries which occurred when the defendant was not present and presented opinions of physicians that the fatal injuries were not accidental, based in part upon evidence of all the injuries received, including those not attributable to the defendant.

We concluded in *Stevens,* after balancing the probative value of the evidence against its prejudicial effect, that evidence of those prior injuries to the decedent were *not sufficiently connected to the defendant* and should not have been offered or received into evidence for any purpose. Our reasons for concluding so were that most of the evidence of prior injuries was really evidence of injuries which individually might have been accidental or might have been caused by other persons, no direct evidence existed that the defendant had ever struck or abused the decedent or any other child, and, the evidence was such that the mother, just as well as the defendant, could have been charged with the crime. We said:

"If there were any substantial evidence that the defendant had exhibited a tendency toward child abuse, or if there were any direct evidence of his commission either of the act charged or of his having caused the prior injuries intentionally, or even if he were the only logical suspect, we might be more inclined to uphold the verdict, .... As the evidence stands, we cannot." *Stevens, supra,* at 259.

■ Ohnstad's admission that she bit Shannon on the cheek certainly satisfies the requirement adopted in *Stevens* that evidence of the prior act be "substantial" or "clear and convincing." *Id.* at 257.

■ Ohnstad also relies on *Stevens* in arguing that the biting incident was the only evidence presented by the State which tended to prove the culpability requirement and therefore no *independent* evidence existed that Ohnstad culpably committed the alleged act. In *Stevens,* we said that before other crimes or acts evidence may be considered at all, there must be "proof of commission of the *crime* charged." *Id.* In discussing this requirement we said:

"The jury was correctly instructed on this point by the court's giving of an instruction adapted from the second paragraph of North Dakota Jury Instruction 1316, as follows:

" 'Evidence of other acts of a like nature cannot be considered for any purpose, unless you first find that other evidence in the case, standing alone, establishes beyond a reasonable doubt that the defendant committed the particular *act* charged in the Information.' " *Id.* [Emphasis added.]

Thus, there must be proof of the commission of the particular *act* charged; *i.e.,* in

this case that Ohnstad caused the death of another human being. If such evidence exists, then the prior crimes, wrongs, or acts may be considered for the purpose for which they are admissible under Rule 404(b). There is no doubt that this requirement serves to insure that prior crimes, wrongs, or acts are not used to show that a person of certain character has acted in conformity with that character, by first requiring proof beyond a reasonable doubt that the defendant committed the particular act charged. We believe, as our resolution of the first issue indicates, that the State presented sufficient independent circumstantial evidence to prove that Ohnstad caused the death of Shannon.

In *State v. Forsland,* 326 N.W.2d 688, 692 n. 3 (N.D.1982), we quoted favorably, from 2 Weinstein's Evidence, ¶ 404[08], p. 404–49, a procedure which we believed would eliminate or substantially reduce difficulties in applying Rule 404(b):

"'Rule 404(b) is a specialized rule of relevancy. Accordingly, as with any determination pursuant to Rule 401, counsel must be prepared to 1) identify the consequential fact to which the proffered evidence of other crimes, wrongs or acts is directed . . ., 2) prove the other crimes, wrongs or acts . . ., and 3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence . . . . Evidence which passes muster up to this point must, in addition, satisfy the balancing test imposed by Rule 403 which requires the probative value of the other crimes evidence to outweigh the harmful consequences that might flow from its admission. . . .' "

At trial the State's attorney argued to the trial court as follows:

"MR. HOY: . . . The defense viewpoint is this was purely an accident. The State's viewpoint is that it's not, that she did something to abuse and beat and hurt and injure this child. And the fact that that is our allegation, this prior biting the child out of her frustration and loss of patience with this child shows

that it was no accident on this occasion. It shows her motive for causing the injury, being her frustration and lack of patience with the child. It in general terms conveys the intent necessary for this crime, that is, negligence or reckless conduct involved."

The trial court determined that evidence of the biting incident "goes to the other purposes [articulated in Rule 404(b)] that are admissible." In concluding that the probative value of the evidence was not outweighed by the danger of unfair prejudice, the court noted that the biting incident "occurred in a short period of time from 10 days that the child was in the home."

We do not believe that the trial court abused its discretion in admitting evidence of the biting incident, which occurred just two days prior to the alleged offense. Ohnstad was charged, in part, with the crime of manslaughter under Section 12.1–16–02(1), N.D.C.C., to which " 'there must be a substantial and unjustifiable risk of homicide to establish recklessness, and the risk must be perceived and ignored by the actor.' " *State v. Trieb, supra* [quoting ALI Model Penal Code and Commentaries, *supra,* § 210.3(1)(a), at 51]. The admissibility of evidence of other acts to establish intent and *absence of mistake or accident* is well established in child abuse cases. *State v. Holland,* 346 N.W.2d 302, 309 (S.D.1984) [In prosecution for second-degree murder and manslaughter of child, trial court abused its discretion in refusing to admit evidence of prior abusive acts of defendant because evidence was directed at whether the child's injuries could happen by accident, as maintained by the defendant, and whether or not the defendant could be identified as one who may have harmed the child.]; *United States v. Harris,* 661 F.2d 138, 142 (10th Cir.1981) [Where father accused of murdering eight-year-old son claimed the fatal injuries occurred because he tripped while carrying the child on his shoulders, evidence of many bone fractures sustained by the child two to three months before were admissible, because "particularly in child abuse cases" the "admissibility of other crimes,

wrongs, or acts to establish intent and an absence of mistake or accident is well established," citing *United States v. Colvin*, 614 F.2d 44 (5th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 802 (1980); *United States v. Woods*, 484 F.2d 127 (4th Cir.1973), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974)]. *See United States v. Grady*, 481 F.2d 1106 (D.C.Cir.1973).

## Photographic Evidence

Ohnstad asserts that the trial court erred in admitting into evidence three photographic slides depicting in color the child's skull after the scalp had been deflected back during the autopsy. The slides were utilized by Dr. Leech as an aid to explain his testimony and to illustrate to the jury the nature and extent of the skull fracture. The slides, taken during the autopsy by a hospital photographer at the direction of Dr. Leech, were projected on a wall of the courtroom in view of the jury. The skull fracture is clearly visible.

We have often said that the use and admission of photographs in criminal trials is largely within the discretion of the trial court. *E.g., State v. Kringstad*, 353 N.W.2d 302, 310 (N.D.1984); *State v. Engel*, 289 N.W.2d 204, 209 (N.D.1980); *State v. Heasley*, 196 N.W.2d 896, 906 (N.D. 1972); *State v. Iverson*, 187 N.W.2d 1, 37 (N.D.), *cert. denied*, 404 U.S. 956, 92 S.Ct. 332, 20 L.Ed.2d 273 (1971).

In *State v. Iverson, supra*, we held that the trial court did not err in admitting color photographs taken of two murder victims prior to an autopsy. The photographs were used to aid the pathologist in presenting his testimony. We said:

"It appears to be a well-settled rule that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question, are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, condition and identification of the body, even though such photographs may have the additional effect of tending to excite the emotions of the jury." *Id.* [Citations omitted.]

In *Iverson, supra*, we discussed *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101, *cert. denied*, 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965), a case in which the Supreme Court of South Dakota held, in affirming a conviction of manslaughter by child abuse, that the trial court did not abuse its discretion when it admitted photographs and colored slides of the children taken prior to and during the course of an autopsy. We quoted in *Iverson* the following language from *Zobel:*

" 'There was no indication they were distorted or did not portray an accurate representation of the deceased children. Photographs, slides and X-rays are admissible when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue. They are not rendered inadmissible merely because they vividly bring to jurors details of a crime or incidentally tend to arouse passion and prejudice. They are a common and recognized medium in this day for depicting events.' " *Iverson, supra* [quoting *Zobel*, 134 N.W.2d at 111].

Ohnstad argues the State had available to it other means by which to show the jury the nature and extent of the skull fracture, including X-rays, and sketches tracing the length of the fracture which were attached to the autopsy report. Prior to the admission of the slides, Dr. Leech testified that X-rays, two of which were earlier admitted into evidence, "will not show the extent [of the skull fracture] to the same degree and in clarity that the slides will. That is, after all, the purpose of the autopsy." The trial court, in overruling Ohnstad's objection that the slides were nothing more than cumulative evidence designed to inflame the emotions of the jury, noted that "[t]he

X-rays do not show the dimensions of the fracture with clarity or with particularity."

■■■ Ohnstad, relying primarily on *People v. Turner,* 17 Mich.App. 123, 169 N.W.2d 330 (1969) [distinguished in *Iverson, supra*], urges this Court to adopt the rule that a trial court should allow a photograph to be admitted *only* after the State establishes that either no alternative methods of proof are available or that an issue is so highly controverted as to be incapable of proof through alternative means. *Turner, supra,* 169 N.W.2d at 334 [quoting *People v. Rogers,* 14 Mich.App. 207, 165 N.W.2d 337, 342 (1968) (Kavanagh, J., concurring)]. We decline to adopt such a rule. This requirement was explicitly rejected by the Supreme Court of Michigan in *People v. Eddington,* 387 Mich. 551, 198 N.W.2d 297, 300–01 (1972) ["The People are not required to present their case on any theory of alternative proofs."]. *See also State v. Hamm,* 89 S.D. 507, 234 N.W.2d 60, 66–67 (1975) [It was not an abuse of discretion to admit, in prosecution for murder, a number of color slides taken of the victim during the course of an autopsy, notwithstanding that the matter depicted on the slides could have been described in words or by diagrams.].

Ohnstad also argues that the slides have no probative value because they do not accurately portray the skull fracture as it existed on November 3, 1982.

■■■ A photograph must be a true and accurate representation of the relevant facts as observed by the witness "at a time pertinent to the inquiry" [*State v. Engel, supra*] or, as we said in *Iverson, supra,* "at the time in question." Dr. Leech testified that the slides fairly and accurately depict the nature and full extent of the skull fracture as it existed *at the autopsy.* He pointed out to the jury on the slides the fracture line and also those parts of the fracture which extended along the suture lines of the skull. The jury was made aware of the possible differences in the nature and extent of the fracture as it existed on November 3, and as depicted in the slides. Dr. Leech testified that the separation or width of the fracture as shown by the slides was caused by the increased intracranial pressure resulting from brain swelling. He also testified as follows:

"Q. [By Mr. Racek]. In other words, Doctor, the fracture we saw in these slides could have been significantly different than how it existed on November 3rd?

"A. No, no way.

"Q. But it could have expanded?

"A. It could have expanded. It's conceivable that it might have extended along the frontal suture, not the back suture, after admission to the hospital. But the vast majority of this abnormality existed on the day this child came in."

■■■ Prior to the admission of the slides, Dr. Leech, in describing what he had found during the autopsy, testified that it would be easier to *show* the skull fracture rather than attempt to describe it because of its complex nature. The subject matter depicted in the slides was relevant and restricted to what was reasonably necessary to furnish a visual aid to the jury in arriving at a fair understanding of the nature and extent of the skull fracture at the time of the autopsy. It did not include laboratory instruments and other irrelevant matter found to be improper in *People v. Turner, supra.* We conclude that the trial court did not abuse its discretion in admitting this evidence.

*Expert Testimony*

Ohnstad contends that the trial court erroneously accepted Dr. Leher and Dr. Norberg as expert witnesses, thereby allowing "cumulative, non-expert" opinion testimony regarding the cause of the injury sustained by Shannon to be admitted into evidence.

Rule 702, N.D.R.Ev., governs the admission of expert testimony. It reads:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ Thus, the test for admission of expert testimony is whether or not such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and whether or not the witness is qualified as an expert. *Patch v. Sebelius,* 349 N.W.2d 637, 643 (N.D.1984); *State v. Skjonsby,* 319 N.W.2d 764, 790 (N.D.1982); *South v. National Railroad Passenger Corp.,* 290 N.W.2d 819, 831 (N.D.1980).

Dr. Leher testified that he has a degree in medicine and is a board certified pediatrician practicing at Dakota Clinic. He testified that during the course of his seven years of practice he has seen five to six thousand children annually and has seen a number of children every year who have sustained head injuries. It was Dr. Leher who first examined and treated Shannon. He testified that he referred Shannon to Dr. Koski because he believed that his expertise was not adequate as to the treatment, but was adequate as to the diagnosis, of the child's injury.

Dr. Norberg testified that he is board certified in the specialties of pediatrics and pediatric cardiology. At the time of trial he was in his eighth year of practicing both specialties at St. Lukes Hospital and the Fargo Clinic. Dr. Norberg testified that he sees approximately two thousand children annually. He has seen injuries of children ranging from very minor trauma to the extremely severe multiple injured child, including children with severe head injuries. Dr. Norberg is also the director of the pediatric intensive care unit at St. Lukes, and in this capacity is responsible to supervise the general care and policies of the unit, and to provide direct patient care to those children admitted to the unit as a consultant to the attending physician. Dr. Norberg testified that both he and Dr. Koski provided the primary care for Shannon.

■ It is well established in this State that the determination to admit or not admit expert testimony under Rule 702, N.D.R.Ev., rests within the sound discretion of the trial court, and its determination will not be reversed on appeal unless the court has abused its discretion. *Patch v. Sebelius, supra; State v. Skjonsby, supra; State v. Dachtler,* 318 N.W.2d 769, 771 (N.D.1982); *South v. Nat'l R.R. Passenger Corp., supra.* We believe that the knowledge, training and education of Dr. Leher and Dr. Norberg, their experience in the care and treatment of children in general, and their familiarity with the injury sustained by Shannon in particular qualified them as experts. We find no abuse of discretion in the trial court's ruling permitting them to give their opinions as experts.

### Newspaper Article

In denying Ohnstad's motion for judgment of acquittal at the close of the State's case, the trial court said:

"It is up to the jury to decide whether there be actions of the defendant ... recklessly or negligently, or that there were no actions on her part at all that caused the death of Shannon. There is an issue of fact and ... the evidence is sufficient at this time to sustain a conviction if that be the verdict of the jury."

The statements were made out of the presence of the jury, but in the courtroom. The following day Ohnstad's attorney brought to the trial court's attention that morning's edition of the *Fargo Forum,* which contained on page 5 an article concerning the trial. The defendant moved for a mistrial because of the following language which appeared in the article: "Garaas said sufficient evidence has been presented to sustain a jury verdict and a decision on some issues of fact." The motion for mistrial was denied.

Ohnstad, relying on *Robinson v. State,* 438 So.2d 8 (Fla.Dist.Ct.App.1983), contends that the trial court erred by not taking steps to determine what effect, if any, the newspaper article had on the jury. In *Robinson v. State, supra,* it was held that the trial court erred in *refusing* to inquire as to whether or not the jurors had

read certain news accounts relating to the defendant's trial.

We recently recognized in *State v. Voeller*, 356 N.W.2d 115, 120 (N.D.1984), that when publicity takes place during trial, the defendant generally cannot show actual exposure or prejudicial effect unless the court allows the jury to be polled in some manner. In this case, however, Ohnstad's attorney expressed a desire that the jurors *not* be polled:

> "Mr. Knox: We are not going to go out and question the individual jurors as to whether or not they read the article because all that would do is incite their curiosity."

Under these circumstances, we conclude that the defendant waived her right to complain that the trial court did not determine if any of the jurors had read or heard about the newspaper article.

The trial court clearly and repeatedly admonished the jury during the trial not to read about the case in newspapers or listen to or view news accounts of the trial on television or radio. In the absence of contrary evidence, a presumption exists that a jury performed its duties in accordance with the law and was not influenced by outside events or evidence. *State v. Voeller, supra,* at 121; *State v. Olson,* 274 N.W.2d 190, 193 (N.D.1978).

Ohnstad's conviction was not obtained in a trial atmosphere utterly corrupted by press coverage, from which we could presume unfairness of a constitutional magnitude. *Voeller, supra.* We conclude that Ohnstad has not shown prejudicial error in conjunction with this issue.

### Jury Instructions

Ohnstad's final contention is that the trial court erred in refusing to give two jury instructions which she requested concerning the definition of "culpable negligence" and the definition of "negligently."

Defendant's requested jury instruction number seven (North Dakota Jury Instruction 1701)[2] defines the term "culpable negligence," which was an element of manslaughter in the second degree as that crime was defined in the old criminal code. *See* § 12–27–19, N.D.C.C. (repealed by S.L.1973, ch. 116, § 41, effective July 1, 1975); *State v. Gulke,* 76 N.D. 653, 38 N.W.2d 722 (1949). The trial court properly refused to submit the instruction because it did not correctly apprise the jury of the applicable law.

Defendant's requested jury instruction number thirteen[3] incorrectly equates the term "negligently" with a *conscious and clearly unjustifiable* disregard of the substantial likelihood of the exist-

---

2. Defendant's requested jury instruction number seven reads as follows:

    "CULPABLE NEGLIGENCE

    "Culpable negligence is such recklessness or carelessness proximately resulting in injury or death as imports a *wanton or reckless disregard* of consequences or a heedless indifference to the safety and rights of others, under circumstances involving danger to human life. Culpable negligence means something more than ordinary negligence, but falls short of intentional harm. Culpable negligence is negligence that is blameworthy and imports criminal responsibility. Whether the conduct of the defendant constituted culpable negligence is a question of fact for you to determine." [Emphasis added.]

3. Defendant's requested jury instruction number thirteen reads as follows:

    "The Defendant has been charged with the crime of negligent homicide. A person is guilty of the crime of negligent homicide if she negligently causes the death of another human being.

    "Negligently means if she engages in conduct in unreasonable disregard of the substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct. In order for you to find the defendant guilty in this case, you must find from the evidence that she engaged in the alleged incident in an unreasonable disregard of a substantial likelihood that the death of another human being would result. *You must find that such disregard was not only conscious and clearly unjustifiable but also involved a gross deviation from acceptable standards of conduct.* If you are not satisfied by competent evidence beyond a reasonable doubt that the defendant engaged in the unreasonable conduct defined in this instruction, you must find the defendant not guilty." [Emphasis added.]

ence of the relevant facts or risks. As earlier stated, while *reckless* conduct involves a "conscious and clearly unjustifiable disregard ... [§ 12.1–02–02(1)(c), N.D. C.C.]," negligent conduct involves only an "unreasonable disregard...." § 12.1–02–02(1)(d), N.D.C.C. The negligent person need not be *aware* of the likelihood that he is engaging in the prohibited conduct.

Thus, the trial court did not err in refusing to give Ohnstad's requested instructions. We have reviewed and considered as a whole the jury instructions which were given and conclude that, under the circumstances of this case, the trial court fairly informed the jury of the applicable law.

The judgment of conviction is affirmed.

GIERKE, PEDERSON and VANDE WALLE, JJ., concur.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.